IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| RIVERBOAT GROUP, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 3:18-CV-00147-WC |
| | ) | |
| IVY CREEK OF TALLAPOOSA, | ) | |
| LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Riverboat Group, LLC, filed this case against Defendant Ivy Creek of Tallapoosa, LLC, alleging claims of breach of contract, open account, and unjust enrichment arising out of a contract between the parties. Before trial, Plaintiff agreed to dismiss the claims of open account and unjust enrichment, and its remaining breach of contract claim was tried before the undersigned on November 4, 2019. In this post-trial opinion, I conclude that Plaintiff cannot recover from Defendant for breach of contract damages because it is guilty of the first material breach of the contract and cannot demonstrate its own substantial compliance with the contract.

## I.    FINDINGS OF FACT

Below are the facts as I find them based on evidence presented at a trial, which consisted of three fact witnesses and documentary exhibits[1] submitted by both parties.

---

[1] Defendant's Exhibit 15 is a disk containing 823 pages of Bates-stamped documents, only some of which were admitted into evidence at trial. Although Defendant submitted hard copies of Exhibits 1–14, the Court allowed the disk to be admitted separately as an exhibit with the understanding that only properly admitted evidence from the disk would be considered by the Court.

Plaintiff is Riverboat Group, LLC, which does business as Vanguard Labs, LLC. Clayton White ("White"), who testified at trial, was in-house counsel and business manager for Riverboat Group, LLC. Because the parties referred to the Plaintiff as "Vanguard" throughout the trial, the Court will do so here. Vanguard is located in New Orleans, Louisiana, and has no locations in Alabama. Although Vanguard has no employees, it pays another company, Poydras Healthcare Advisors ("Poydras"), to provide its staffing needs. White testified that Poydras provided the people and managed the business operations for Vanguard, including billing and accounting employees, a lab director, and the employees who operate the lab.

Defendant is Ivy Creek of Tallapoosa, LLC, which does business as Lake Martin Community Hospital. As with Plaintiff, the Court will refer to Defendant by the name most often used by witnesses at trial, which in this case is "Lake Martin." Michael Bruce ("Bruce") is the CEO of operations and administration at Lake Martin. Augustine LeTorre ("LeTorre") works for Ivy Creek Health Care, the parent company of Ivy Creek of Tallapoosa LLC, and manages Lake Martin's largest clinic. Bruce and LeTorre both testified at trial.

The contract between the parties arose out of discussions that began in Fall 2015 when Michael Bruce was contacted by an individual named Kevin Robson ("Robson") about a possible business opportunity for Lake Martin and Vanguard. Bruce understood from Robson that Vanguard had previously been submitting claims to Blue Cross Blue Shield Insurance Company ("Blue Cross"), but it could no longer do so because they had been "kicked out" of the state by Blue Cross. As a result, Vanguard needed Lake Martin

to receive orders for lab tests from physicians, refer the orders to Vanguard, and then submit billing claims to Blue Cross.[2]

Bruce testified that a major selling point by Robson was that he had a network of doctors already in place who would be using a software program called Engage DX that was developed for pain management physicians. Engage DX was designed to ensure that lab tests ordered by the doctors satisfied Blue Cross's requirements for medical necessity. White stated that he was familiar with the sales presentation on Engage DX that Robson made to Bruce, and the presentation documents White reviewed while on the witness stand confirm that the sales presentation was done on behalf of Poydras.

---

[2] At the summary judgment stage, Defendant filed an affidavit signed by Michael Bruce indicating that the parties had entered into a contract to circumvent Blue Cross regulations prohibiting out-of-state providers from submitting claims for drug screens. Specifically, the affidavit stated that Vanguard, which had no locations in Alabama, had previously submitted claims to Blue Cross but, due to the new regulations, Vanguard needed an Alabama provider to submit the claims. These assertions were troubling to the Court, as they begged the question of whether false representations were made to Blue Cross that the lab tests were performed in Alabama. Under Delaware law, no party "may exercise his broad power to enter into contract relations with another so as to offend against what the law deems to be sound public policy." *Maddock v. Greenville Ret. Cmty., L.P.*, No. CIV.A. 12564, 1997 WL 89094, at *5 (Del. Ch. Feb. 26, 1997) (citations omitted). Further, courts do not aid one party against another when permitting recovery enforces an illegal contract. *Eisenman v. Seitz*, 26 Del. Ch. 185, 25 A.2d 496, 498 (1942) (citations and quotations omitted). At trial, Defendant's counsel made similar allegations during his opening statement, calling it "borderline healthcare fraud," and the issue was alluded to a couple of times, including Bruce's statement that Vanguard had been "kicked out" of the state. However, the issue was not factually developed at trial, as there was no evidence presented on Blue Cross's regulations regarding out-of-state providers, how they had changed, and exactly what was prohibited. "Once the case proceeds to trial, the full record developed in court supersedes the record existing at the time of the summary-judgment motion." *Wilkerson v. Seymour*, 626 F. App'x 816, 818 (11th Cir. 2015) (quoting *Ortiz v. Jordan*, 562 U.S. 180, 184 (2011)). Due to a lack of evidence presented at trial, the Court cannot determine whether Blue Cross prohibited performance of laboratory services by an out-of-state provider, such that obtaining payment from Blue Cross based on a representation that the lab tests were performed in Alabama would be fraudulent, or if Blue Cross allowed this type of referral relationship and simply prohibited billing by an out-of-state provider. Consequently, being unable to determine whether the referral arrangement was permitted or whether the parties' whole purpose in forming the contract was illegal and against public policy, the Court cannot reach the issue of whether the contract void. *Sternberg v. Nanticoke Mem'l Hosp., Inc.*, No. CIV.A. 07C-10-011, 2012 WL 5830150, at *6 (Del. Super. Ct. Feb. 13, 2012), *aff'd*, 62 A.3d 1212 (Del. 2013) (stating that a court's power to declare a contract void as against public policy under Delaware law "must be exercised with caution and only in cases that are free from doubt") (citations and quotations omitted).

Bruce testified that he knew Robson worked in sales but that Robson held himself out as someone who worked for Vanguard.   In fact, Bruce had never heard of White, and Robson was his only contact at Vanguard, from the initial discussions about contract formation through the end of the parties' contractual relationship.  LeTorre also testified that Robson was his only contact at Vanguard.  According to LeTorre, Robson identified himself as the person running the project for Poydras, Riverboat, and Vanguard, that he was in charge, and that LeTorre should go through him only.  The instruction from Robson coincided with what LeTorre observed when he visited Vanguard's lab in New Orleans, where Robson was the person who showed LeTorre around the lab and explained how the lab samples would be handled.

Vanguard and Lake Martin's contract became effective May 11, 2016.  Pursuant to the contract, Vanguard agreed to perform clinical laboratory tests on samples received from Lake Martin, and Lake Martin agreed to pay Vanguard $400.00 for each test.  The contract also contained the following provisions, in which Lake Martin is the "Facility" and Vanguard is the "Laboratory":

> Section 1, Paragraph 2:  Service Orders. Facility shall arrange for every specimen to be sent to the Laboratory with an appropriate laboratory test requisition form signed by a physician or practitioner licensed by state law and authorized to order such testing, test(s) requested, diagnosis codes, other information required by payors to establish medical necessity, and billing contact information.
> …
>
> Section 1, Paragraph 5:  Facility's Responsibilities.… If any payor requires that Facility provide the ordering physician/practitioner's medical records for a pre-payment or post-payment review or audit being conducted by payor, Facility will notify Laboratory in writing (via email is permissible), and Laboratory shall assist in obtain [sic] the pertinent medical records and

4

provide them to Facility within the timeline designated by Facility such that Facility can meet the timeline required by payor.

In July 2016, only two months after the contract became effective, Bruce learned that Blue Cross was rejecting claims pending further investigation. Auggie LeTorre notified Robson of the denied claims in writing on July 27, 2016. Def. Ex. 4. After that, there were multiple email exchanges among Robson, Bruce, LeTorre, and others about the rejected claims.

Bruce was the only witness who testified with knowledge of billing and coding requirements of Blue Cross. He testified that the claims submitted by Lake Martin to Blue Cross were covered claims but that Blue Cross denied them because Lake Martin could not produce the physicians' medical records that were required to establish medical necessity. According to Bruce, the pain management labs in this case were ordered so doctors could make sure patients were taking their medications. The type of testing got out of hand, as Bruce described it, so Blue Cross established regulations in March 2015 that limited qualitative testing to once every three months. Blue Cross also required that a doctor get a positive result on a quick "dipstick" quantitative test, which is cheaper and does not require a high-complexity lab to perform, before ordering a qualitative test. Additionally, doctors had to complete an extensive pain matrix to verify that a patient was eligible for a qualitative test. Other requirements included performing an adequate assessment of patient history and risk of substance abuse, as well as checking to see if the patient was seeking drugs from another provider.

Bruce testified that Robson knew about the above requirements when he approached Bruce and that the purpose of Engage DX was to ensure all the requirements were met before a lab test was ordered. Engage DX required the doctors to answer a series of questions related to the patient and the need for lab testing. At the end of the questioning, Engage DX would either confirm that all requirements for medical necessity were met or the lab test would be flagged in the system. All of the information entered by the doctors became part of the patients' medical records, and it was required to be submitted to Blue Cross, upon request, in order for a claim to be covered.

In response to Bruce's testimony that the claims were denied based on medical necessity, Vanguard's counsel suggested to Bruce that the codes used by Lake Martin to bill for Vanguard's lab work were simply codes for non-covered services, such that no amount of documentation produced to Blue Cross would have mattered. However, Bruce disputed this contention, pointing out that Blue Cross does not have codes for services that are never covered. As Bruce explained it, the codes used by Lake Martin were for covered services as long as the tests were performed to confirm that the patient was taking prescribed medication, as opposed to another drug such as cocaine or marijuana. Lake Martin could bill under those codes but only to test for pain management drugs when all of the other medical necessity requirements – as documented in the physician's records showing the prescribed medication, the drug to be tested, and the reasons for ordering the test – were met.

Vanguard's counsel also made a distinction between *comprehensive* and *confirmatory* panels and another distinction between *composite* and *confirmatory* panels, suggesting that composite or more comprehensive claims were simply not covered and, again, that no amount of supporting medical records would have changed this. However, Bruce testified that all labs sent to Vanguard in this case were confirmatory panels. White admitted at trial that he had no contact with Blue Cross about the rejected claims and did not get involved in trying to understand why they were rejected and what was required to get the claims paid. Bruce was the only witness with knowledge of Blue Cross's billing requirements and the only witness in a position to understand why the claims were rejected. Additionally, his testimony about the medical necessity requirements and billing codes was undisputed, and the Court found him to be a credible witness. Accordingly, the Court accepts Bruce's testimony that Blue Cross's rejection of the Vanguard claims was not based on billing codes or the type of panel tested and that the claims would have been covered if the patient medical records establishing medical necessity had been produced.

The parties' contract required Lake Martin to notify Vanguard in writing if a payor requested medical records as part of an audit. As mentioned above, when Blue Cross requested medical necessity information, LeTorre notified Robson in writing by email. He also notified an individual named Tim Repole ("Repole"), who, based on email correspondence admitted at trial, worked for a company called Matryx Life.[3] Because

[3] There was no explanation at trial about Tim Repole's role in this matter except that he was somehow involved in compliance and that he brought a few doctors into the billing arrangement. The email correspondence admitted into evidence demonstrates that Repole was actively working with Robson to obtain the documents requested by Blue Cross.

Lake Martin did not have access to the medical records for the doctors within Robson's network, they looked to Robson to gather the requested documents. After being notified, Robson went to work trying to obtain the information requested by Blue Cross. LeTorre testified that he had numerous telephone conversations, emails, and texts with Robson about the requested documents and that Robson guaranteed he would get the documents. Robson participated in email exchanges about what was needed, at one point he hired a team of experts to assist, and he kept LeTorre and Bruce informed on his progress. Notably, none of the emails in evidence suggest that Lake Martin was expected to play any role in obtaining the medical records, and it is clear from documentary evidence and testimony by Bruce and LeTorre that Robson and Repole assumed that responsibility.

With respect to Lake Martin's obligation to provide written notice of the need for medical records, White testified that notice to Robson did not satisfy that obligation because Robson was not an agent or employee of Vanguard. According to White, Robson owned and worked in the sales group for a company called TAQ,[4] and he described Robson as a third party who simply carried information back and forth between Vanguard and Lake

---

[4] Other than its name and the fact that it was a "sales group," the parties offered no information about TAQ; however, the fact that Robson worked for a separate company is not dispositive of whether he was an agent of Vanguard. Robson seems to have been associated to some extent with several different companies identified in this lawsuit. Vanguard's building had three labs: Vanguard, Lazarus Services, and UTC Labs. At one point there was a fourth lab in the building as well. White testified that the labs were separate entities but that Vanguard/Riverboat had contracts with all of them to perform lab work if needed. Bruce and LeTorre testified that they believed all of these companies were the same and that Robson either worked for or was somehow in charge of them. Any confusion seems warranted, as emails regarding the rejected Blue Cross claims referred to the claims as "Lazarus" or "Lazarus/Vanguard" claims. Def. Exs. 4, 5, 7, and 13. Additionally, Bruce testified that there was confusion in the beginning as to whether the party entering into the contract with Lake Martin would be Lazarus, Riverboat, or Vanguard. Unfortunately, the evidence presented at trial did not adequately clarify the relationships among White, Robson, and the other labs or business entities.

Martin.  Vanguard paid Robson a commission based on the number of laboratory samples he brought in, but he was paid only when Vanguard was paid, much like a car dealership pays a salesman.  White said Robson made introductions between Vanguard and Lake Martin and that he gathered information, but he did not negotiate the contract and was not authorized on behalf of Vanguard to put the project in place.  However, Bruce testified that Robson did all of the negotiating, and White admits that he never met or spoke to Bruce during negotiations, after the contract was formed, or at any time before this lawsuit was filed.  When asked how Robson even found out there was a problem with the claims, when he was supposedly just a courier of information, White said Robson was the one in contact with Lake Martin while White was in New Orleans running the business.

White even testified that Robson was not an employee or representative of Poydras. Not only is Poydras the company listed on the sales materials Robson presented to Lake Martin, which would indicate that Robson was authorized to make a presentation on behalf of Poydras, but the emails admitted at trial reflect that Robson had a Poydras email address and that he used the Poydras Healthcare Advisors logo as part of his email signature.  Def. Exs. 7, 9, 10, 12–14.   Interestingly, White had a Poydras email address as well. Def. Ex. 14.  White was specifically asked where Robson worked, and he testified only that Robson worked for TAQ.  His failure to be forthcoming about the above information concerning Poydras, which suggests that Robson had some affiliation with the company providing management employees to Vangard and that White did as well, is viewed by the Court as an effort to hide facts related to the issue of agency, and it diminished White's credibility as a witness.

On the issue of credibility, there were other occasions where White appeared to testify in an evasive manner.[5]  Bruce testified that he was approached by Robson after Vanguard was "kicked out" of the state and could no longer submit claims to Blue Cross. White never disputed that Vanguard had been billing Blue Cross before the parties entered into a contract.  However, White testified that he had no knowledge of the Blue Cross regulation prohibiting Vanguard from submitting claims, and he said the reason Vanguard did not submit claims was because he lacked the staff to manage the Blue Cross contracts in different states.  Regardless of why Vanguard was prohibited from billing Blue Cross, White did not dispute Bruce's testimony that Vanguard had been billing Blue Cross previously.  As the person running the business in New Orleans, White certainly would be expected to know that he could bill Blue Cross one day but not the next and the reasons for that change.  For this reason, the Court found White's testimony to be evasive on this issue.

In another example, when asked if he ever talked to Robson about getting medical charts, White testified that he would ask how things were coming along but that the technical details were outside his expertise or role, as he was more worried about relationships.  Again, it seems unlikely, given his position, that White would not be concerned with the reason Blue Cross rejected $250,000.00 of claims performed by his lab or what was needed to get the claims paid.  Frankly, the Court views this testimony as an attempt to distance Vanguard from those who were working to correct the situation in order to demonstrate that doing so was outside the scope of Vanguard's duties.

---

[5] In one instance while White was testifying, the Court specifically instructed him to be straightforward with his answers.

With regard to obtaining the medical records requested by Blue Cross, White placed the blame for missing documentation on Megan Jackson, a data processor employed by Lake Martin that Vanguard required to be stationed at its New Orleans office to receive lab samples. White said Ms. Jackson was responsible for entering "initial information" into Engage DX when she received lab samples. He then stated that, if the medical necessity documentation was not to be found, Ms. Jackson must have shredded it or did not know where to find it, and there would be nothing to get out of the system if she never entered it. T. 35. However, White also stated more than once that he had no knowledge of the technical side of how things worked.

According to LeTorre and Bruce and in contrast to White's testimony, Ms. Jackson entered information into CPSI, Lake Martin's billing system, not into Engage DX. In fact, the lab orders and specimens were sent directly to Vanguard's lab from the physicians' offices without going through Lake Martin, and the results were sent from Vanguard to the ordering physicians, again without going through Lake Martin. When Ms. Jackson received the specimens at Vanguard's lab in New Orleans, she entered information such as name, billing and insurance information, addresses, and billing codes into CPSI. This testimony is supported by an email dated August 12, 2016, from Robson stating that he had hired a team to manually pull files and enter information into Engage DX and, once that was complete, Ms. Jackson would be able to "go into each one and manually put them into CPSI." Def. Ex. 12.

The information entered by Ms. Jackson into CPSI would go to Lake Martin, where the billing company was located, and would then be sent to Blue Cross. The actual medical

charts –whether entered into Engage DX or not – were retained by the physicians and were never sent to Ms. Jackson. In order for Lake Martin to have obtained all of the documentation required to establish medical necessity before Vanguard performed a lab test, it would have to obtain a patient's medical file from the doctor and review the file before sending the test to Vanguard. Bruce testified that, in his twenty years of healthcare experience, he has never obtained more than a physician's order for a lab test before it was performed (unless precertification was required, as in the case of surgery), and medical charts are needed only if an insurance company requests additional documentation to support a claim.

Furthermore, despite its touted capabilities, it appears that Engage DX was not even capable of capturing the information being requested by Blue Cross. In an email dated August 10, 2016, from Tim Repole in response to LeTorre's request about the status of the medical records requested by Blue Cross, Repole stated:

> It is my understanding that the initial screen information is being sent from UTC to Megan [Jackson] for loading into the system, the medical list is already there and the medical necessity letter is being drafted for review and distribution later today." Moving forward, we will utilize UTC req forms … *until such time Engage DX has the capability to record the necessary information*.[6]

Def. Ex. 11 (emphasis added). In the August 12th email from Robson mentioned above, he states that Repole had gone to the various clinics to review medical records but that the required documentation was not there. Thus, not only is White's testimony about Ms.

---

[6] This email, proposing use of a UTC Labs form, is another example of how the various entities involved in this lawsuit are intertwined.

Jackson's role of entering information into Engage DX contradicted, but it is clear that the records sought should have been generated by a physician and contained within his files, that the records did not exist, and, even if they had, Engage DX could not have recorded them.

Bruce testified that Vanguard provided absolutely nothing in response to his request to produce the documents Blue Cross required in order to pay the claims. When asked about Vanguard's obligations to produce documents, White said that Vanguard was required only to *assist* in obtaining them. When asked what Vanguard did to assist, he could only describe Robson's efforts, including his work with various people at Poydras to retrieve information out of the software system. This is another example of White's inconsistent testimony. He admits that Vanguard at least had a duty to assist in obtaining the documents requested by Blue Cross. However, if the Court were to accept White's testimony that Robson was not Vanguard's agent, it would mean that Vanguard took no action whatsoever to fulfill that obligation. Vanguard cannot deny that Robson is its agent yet claim his actions fulfilled its obligation to "assist" under the contract.

During the course of the contract, Vanguard sent the following invoices to Lake Martin for laboratory services:

| Date | Amount | Approximate Number of Tests Performed at $400 each |
|---|---|---|
| 07/05/16 | $22,533.91 | 56 |
| 07/22/16 | 101,640.00 | 254 |
| 08/01/16 | 146,300.00 | 365 |
| 09/07/16 | 33,600.00 | 84 |
| 09/07/16 | 730.01 | 2 |
| 09/16/16 | 13,133.88 | 32 |
| 09/23/16 | 23,153.19 | 57 |

| | | |
|---|---|---|
| 09/30/16 | 11,521.07 | 28 |
| 10/25/16 | 54,601.64 | 136 |
| | $407,213.70 | 1,014 |

The total amount billed by Vanguard to Lake Martin through the invoices listed above is $407,213.70. Those invoices reflect a credit of $8,085.00 on September 7, 2015, and, with that credit, the total amount of laboratory services performed was $399,128.70 (Pl. Ex. 2). According to Bruce, Lake Martin paid Vanguard for all lab tests that were reimbursed by Blue Cross, but it did not pay Vanguard for the claims rejected by Blue Cross. Vanguard claims Lake Martin owes $250,024.81 in unpaid invoices plus $33,637.14 in interest, for a total of $283,661.95. Lake Martin did not dispute that amount.[7]

## II.    DISCUSSION

The parties agree that the contract between them is governed by and should be construed in accordance with the laws of Delaware. Under Delaware law, to sustain a breach of contract claim, the plaintiff must establish (1) the existence of an express or implied contract; (2) the breach of an obligation imposed by that contract; and (3) resulting damages to the plaintiff. *Edelstein v. Goldstein*, No. CIV.A.09C-05-034DCS, 2011 WL 721490, at *5 (Del. Super. Ct. Mar. 1, 2011) (citing *VLIW Tech., LLC v. Hewlett–Packard Co.,* 840 A.2d 606, 612 (Del. 2003)). "As a general rule, the party first guilty of a material breach of contract cannot complain if the other party subsequently refuses to perform." *Id.* (quoting *Hudson v. D & v. Mason Contractors, Inc.,* 252 A.2d 166 (Del. Super. Ct. 1969)).

---

[7] Defendant's Exhibit 1 shows that Blue Cross sought a refund from Lake Martin Hospital in the amount of $1,573.373.60; however, Bruce testified that the overpayment sought by Blue Cross involved lab testing samples sent to Vanguard in addition to samples sent to another laboratory before Lake Martin entered into a contract with Vanguard. That amount was reduced to $1,442,832.94 and then lowered to $1,009,983.00 when Blue Cross agreed to a 30% reduction (Def. Ex. 2).

Additionally, a plaintiff alleging breach of contract must demonstrate substantial compliance with all the provisions of his contract in order to recover damages for any breach. *Id.* (citations omitted).

In this case, Lake Martin does not dispute the existence of an express contract or that it failed to pay Vanguard $250,024.81 for lab tests. However, Lake Martin asserts that it gave notice to Vanguard, through Robson, of Blue Cross's audit and request for medical records and that Vanguard failed to provide those records, thereby breaching the contract and preventing Vanguard from demonstrating its own substantial performance under the contract. Thus, the questions before the Court are whether Robson was an agent of Vanguard such that written notice to Robson constituted notice to Vanguard; whether Vanguard was required to provide the medical records requested by Blue Cross; and, if these two questions are answered in the affirmative, whether Vanguard's failure to provide the medical records constitutes a material breach and prevents Vanguard from establishing its own substantial compliance under the contract.

### (A)   Kevin Robson was Vanguard's agent.

As explained above, Lake Martin was required to give written notice to Vanguard if a payor requested pertinent medical records during an audit. It is undisputed that Robson had written notice of the audit and the records being requested. White, however, claims that Robson was not an agent of Vanguard, and, as a result, Lake Martin failed to comply with the provision requiring written notice.

Under the common law of agency, there are two main forms of authority: actual and apparent. An agent has actual authority when he reasonably believes, based on the

principal's manifestations to the agent, that the principal wishes the agent to act accordingly. *Parke Bancorp Inc. v. 659 Chestnut LLC*, 217 A.3d 701, 712 (Del. 2019) (quotations and citations omitted). Apparent authority, on the other hand, "is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." *Id.* (quoting *Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 799 (Del. Ch. 2014) (quoting Restatement (Third) of Agency § 2.03))). It is authority that the principal knowingly or negligently permits the agent to exercise or holds him out as possessing. *Tibco Software, Inc., v. nThrive Revenue Systems, LLC*, No. N18C-08-072 MAA, 2019 WL 6216229, at *8 (Del. Super. Ct. Nov. 21, 2019) (quotations and citations omitted). In this case, it is not necessary to discuss actual authority because the Court concludes that Robson at least acted with apparent authority.

In *Sarissa Capital Domestic Fund LP v. Innoviva, Inc.*, the court recognized that a non-agent director has apparent authority to bind a corporation when a third party reasonably believes the director has such authority and that belief is traceable to the corporation's manifestations. No. CV 2017-0309-JRS, 2017 WL 6209597, at *19 (Del. Ch. Dec. 8, 2017), *judgment entered,* (Del. Ch. 2017) (citations omitted). Such a manifestation may occur when a corporation places someone in charge of a transaction or situation and, in particular, when a corporation designates the person as its exclusive channel of communication with a third party. *Id.* (quotations and citations omitted). The plaintiffs in *Sarissa* believed that a particular individual spoke on behalf of the defendant, and the court

held it to be reasonable because (1) that person was the company's lead negotiator in settlement discussions; (2) he was the only board member with whom plaintiff spoke during a critical time period; (3) defendant never indicated that the agent was not authorized to act on its behalf; and (4) plaintiffs' reasonable belief was traceable to the company's own actions of allowing him to be the lead negotiator and exclusive channel of communications. Thus, the court held that an apparent agency relationship had been created and that the agent had the authority to bind the principal.

As in *Sarissa*, Robson was Lake Martin's only contact with Vanguard during discussions leading up to contract formation. White denied that Robson negotiated the parties' contract, and he went so far as to deny that Robson even had authority to put the project together for Vanguard. He testified that Robson could not have signed the contract and could not have changed the price of the lab work. However, Bruce testified that Robson was the only person with whom he negotiated, which is certainly believable considering that Robson was Bruce's only contact before the contract was signed. Regardless of whether Robson's authority was broad enough to execute a contract or set prices, he was, in fact, the one and only person who negotiated the contract and put the deal together for Vanguard.

He was also Lake Martin's only contact after the contract was formed and during the critical time of the Blue Cross audit. White admitted that he never engaged with Bruce when claims started getting rejected and that he left everything to Robson. Thus, he was aware that Robson was the one making efforts to satisfy Blue Cross so Vanguard could get paid. White also admitted that he never even met anyone at Lake Martin until after this

lawsuit was filed. There can be no question that White knowingly allowed Robson to be Vanguard's exclusive channel of communication from the time of initial contract discussions through the critical time of the audit and the filing of this lawsuit. Accordingly, Bruce and LeTorre's belief that Robson was Vanguard's agent is traceable to White's own actions.

The Court further finds that the belief as to Robson's agency was reasonable. When LeTorre went to Vanguard's office in New Orleans, Robson is the one who met him and showed him around the lab. White was aware that Robson sent emails among Bruce, LeTorre, and White using Robson's and White's Poydras email addresses. These emails would suggest that Robson and White worked for the same company – the company that provided Engage DX to physicians and provided management and operations employees to Vanguard. Further, the email exchanges also refer to the rejected Blue Cross claims as "Lazarus/Vanguard" claims, and at one point the use of documents from UTC Labs was proposed as part of the solution. Robson, White, and the companies involved in this case are so intertwined that, even after a full trial, the Court cannot make reasonable distinctions among them. Therefore, the Court concludes that Bruce and LeTorre's belief that Robson was Vanguard's agent was reasonable. Of course, as well-settled law instructs, notice to an agent acquired while acting within the scope of his authority is imputable to the principal. *Hecksher v. Fairwinds Baptist Church, Inc.*, 115 A.3d 1187, 1201 n.50 (Del. 2015) (citation omitted). Thus, Lake Martin's notice to Robson satisfied its obligation to provide written notice to Vanguard.

**(B)     Vanguard was required to assist in obtaining and to provide physicians' medical records in the event of an audit.**

The contract has two provisions pertinent to the parties' responsibilities concerning documentation, medical necessity, and billing.  The first requires Lake Martin to arrange for specimens to be sent to Vanguard with "other information required by payors to establish medical necessity" (Section 1, Paragraph 2).  The second states that Vanguard, in the event of an audit, would "assist in obtain [sic] the pertinent medical records and provide them to [Lake Martin] within the timeline designated by [Lake Martin] such that [Lake Martin] can meet the timeline required by [Blue Cross]" (Section 1, Paragraph 4).

Plaintiff's interpretation of the contract is that Lake Martin was required to obtain medical necessity documents and that Vanguard was required only to *assist* Lake Martin with obtaining any documents requested in an audit.  Defendant's interpretation is that Vanguard was required to assist but that it was ultimately responsible for providing any documents requested by Blue Cross during an audit so that Lake Martin could comply with Blue Cross's deadline.  However, "[a] contract is not rendered ambiguous simply because the parties do not agree upon its proper construction.  Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Sunline Commercial Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 840 (Del. 2019) (quoting *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992)).  Long-settled principles require courts to read a contract as a whole, giving effect to each term and provision in a way that does not render any provision illusory, meaningless, or

mere surplusage.  *MicroStrategy Inc. v. Acacia Research Corp.*, No. CIV.A. 5735-VCP, 2010 WL 5550455, at *5–6 (Del. Ch. Dec. 30, 2010) (citations and quotations omitted).

In looking at the contract language, the Court can fairly say that the provisions regarding billing and medical documentation are susceptible to both parties' interpretations, as the first provision requires Lake Martin to send medical necessity documents to Vanguard with lab specimens but the second provision contemplates Vanguard providing requested medical records in the event of an audit.  Further, it is clear that the phrase "assist in obtain the pertinent medical records" should have been written as "assist in *obtaining* the pertinent medical records."  Otherwise, the sentence is grammatically incorrect.  If this error is corrected, the contract requires Vanguard to "assist in obtaining the pertinent medical records and provide them to [Lake Martin] within the timeline designated by [Lake Martin]," with the word "assist" applying only to the act of *obtaining* records and Vanguard having a separate responsibility to *provide* the records.  Of course, with respect to such errors:

> [G]rammar and punctuation are of secondary importance to a court in interpreting a contract where such grammar and punctuation reasonably would frustrate the parties' clear intent as evinced from the language used in the contract.   Indeed, a court should not allow the imprecise placement of adverbs and commas to alter the otherwise plain meaning of a contractual provision or to frustrate the overall plan or scheme memorialized in the parties' contract.

*Id. at* *7 (citations and quotations omitted).  However, under Vanguard's interpretation, there would be no need for the next provision in the paragraph, which requires Lake Martin to notify Vanguard of the need for the documents in writing so Vanguard could comply within Lake Martin's designated timeline and Lake Martin could, in turn, comply with the

insurer's timeline. There is no purpose in designating a timeline for Vanguard's compliance if Vanguard's obligation was limited to "assisting," with no real responsibility to do anything, and Vanguard's interpretation would certainly render the provision concerning written notice and a designated timeline illusory, meaningless, and surplusage. For these reasons, the Court finds that the contract is ambiguous.

When contractual provisions are ambiguous, a court's task is to determine the intent of the parties. Delaware law requires a contract to be "read in the light of the intent of the parties as determined by the facts and circumstances surrounding the transaction," meaning the Court will infer the parties' intent. *In re BankUnited Fin. Corp.*, 727 F.3d 1100, 1107 (11th Cir. 2013) (quoting *Rohner v. Niemann,* 380 A.2d 549, 552 (Del. 1977) (citation omitted)).

The facts in this case indicate that the parties never intended for Lake Martin to be responsible for gathering or obtaining the requested medical records from Robson's network of physicians. Credible testimony establishes that all of a patient's medical information was entered into Engage DX by the physician and maintained in the patient's medical record at the physician's office. Reviewing individual patient files obtained from doctors' and confirming that a physician has done everything required to establish medical necessity before ordering lab work is not an industry practice. Witnesses from both sides testified that ensuring medical necessity was one of the purposes of Engage DX. However, when Repole visited the physicians' offices to review the medical records and gather information needed to establish medical necessity, the information did not exist, but Engage DX had failed to flag the test. Additionally, the physicians sent lab orders directly

to Vanguard and received results directly from Vanguard, bypassing Lake Martin altogether. The specimens and any accompanying information were received by Ms. Jackson, a data processor, who certainly was not qualified to make a determination reserved for the treating physician. Finally, when Blue Cross began its audit, Robson immediately began trying to track down the requested documents, even hiring a team of experts to help, so Ms. Jackson could access the records and enter information in to the hospital's billing system.[8] While Robson and Repole provided Lake Martin with updates on their progress and what needed to be done, there was no suggestion by anyone that Lake Martin was responsible for getting the medical records. Based on these facts, the Court cannot infer that the parties intended for Lake Martin to be responsible for obtaining the medical records requested by Blue Cross during its audit, even if those documents related to medical necessity. The Court finds that the intended meaning of the contract was that Vanguard would assisting in obtaining and ultimately provide the pertinent medical records requested during an audit and that Vanguard would provide them within a deadline set by Lake Martin so Lake Martin could comply with the deadline set by Blue Cross.

---

[8] Regarding Engage DX, Lake Martin entered into a contract with Vanguard based on representations that it would weed out the bad claims and, further, that Lake Martin would have access to medical documentation through Engage DX. Engage DX was provided to physicians by Poydras, with which Robson and White have some unexplained affiliation. None of the required information was entered into Engage DX by the physicians, and Lake Martin had no access to patients' medical records located at the physicians' offices. Vanguard argues that Lake Martin bore the responsibility of obtaining medical records and places blame on Lake Martin for being unable to do so, but its inability was due to the inadequacy of and failure to implement the Poydras software. These facts raise the possibility of a defense based on fraudulent inducement, but that defense was not factually developed or otherwise pursued by Lake Martin at summary judgment or trial.

**(C)  Vanguard cannot recover damages from Lake Martin due to its material breach and lack of substantial compliance.**

Finally, the Court finds that Vanguard's failure to provide the pertinent medical records was a material breach of the contract and prevents Vanguard from establishing its own substantial compliance with the contract.   A material breach is a failure to do something so fundamental to a contract that it defeats the essential purpose of the contract or makes it impossible for the other party to perform. *Tektree, LLC v. Borla Performance Indus., Inc.*, No. CIV.A. CPU4-12-00291, 2013 WL 5230705, at *4 (Del. Com. Pl. Sept. 16, 2013) (citations omitted).   White pointed out that the contract between the parties did not make Lake Martin's payment to Vanguard contingent on Blue Cross's payment to Lake Martin; however, there can be no question that an essential purpose of the contract was to perform and bill for lab tests reimbursable by Blue Cross.   Indeed, it was the one and only purpose.   It is the reason Engage DX was created, and the contract was formed so Lake Martin could submit claims to Blue Cross on behalf of Vanguard.   Having found that the contract required Vanguard to provide the pertinent medical records requested by Blue Cross, the Court further finds that Vanguard's failure to do so defeated the essential purpose of the contract.   Further, the breach prevented Lake Martin from performing its obligations under the contract.   Section II, Paragraph 3, of the contract placed the duty of "compliance with all applicable insurance billing regulations" on Lake Martin.   Vanguard's actions prevented Lake Martin from complying with Blue Cross's requirements to submit supporting medical records that were required for payment of a claim.   For these reasons, the Court finds that Vanguard's failure constitutes a material breach of the contract, which

discharged Lake Martin of its duty to perform. *Tektree,* 2013 WL 5230705, at *4 (citing *Brasby v. Morris,* 2007 WL 949485, at *4 (Del. Super. Ct. Mar. 29, 2007), in turn quoting *BioLife Solutions, Inc. v. Endocare, Inc.,* 838 A.2d 268, 278 (Del. Ch. 2003)).

Likewise, the doctrine of substantial compliance prevents recovery by Vanguard. Before it can recover on its breach of contract claim, Vanguard must demonstrate its own substantial compliance with *all* the provisions of the contract. *E. Elec. & Heating, Inc. v. Pike Creek Prof'l Ctr.*, No. 85C-MR-79, 1987 WL 9610 (Del. Super. Ct. Apr. 7, 1987), *aff'd,* 540 A.2d 1088 (Del. 1988) (emphasis added) (citing *Emmet S. Hickman Co. v. Emilio Capaldi Developer, Inc.,* 251 A.2d 571 (Del. Super. 1969)). Substantial compliance is permitted when literal compliance is impossible and substantial compliance "provides the important and essential benefits of the contract." *See Halpin v. Riverstone Nat'l, Inc.*, No. CV 9796-VCG, 2015 WL 854724, at *7 (Del. Ch. Feb. 26, 2015) (quoting *Gildor v. Optical Solutions, Inc.,* 2006 WL 4782348, at *7 (Del. Ch. June 5, 2006)). Although Vanguard performed lab work as required under the contract, it is undisputed that Vanguard failed to produce even one document that Blue Cross requested during its audit. Although Vanguard did not argue that literal compliance was impossible, it is clear that Vanguard cannot show *any* compliance with the provision requiring it to produce the requested medical records, thereby preventing it from establishing its own substantial compliance with all of the provisions of the contract.

## III.    CONCLUSION

For the above reasons, although Lake Martin does not dispute that it failed to pay Vanguard for the lab tests at issue in this case, as was required under the contract, Vanguard

was first guilty of a material breach and cannot establish its own substantial performance under the contract.  Accordingly, Vanguard is not entitled to recover damages from Lake Martin.  The Court will enter a separate final judgment in favor of the Defendant.

DONE this 19th day of February, 2020.


/s/ Wallace Capel, Jr.
WALLACE CAPEL, JR.
CHIEF UNITED STATES MAGISTRATE JUDGE